## IN RE J. C. KALANIANAOLE.

### HABEAS CORPUS.

SUBMITTED JUNE 3, 1895.          DECIDED JULY 2, 1895.

JUDD, C.J., BICKERTON AND FREAR, JJ.

Under Article 31 of the Constitution, which provides that the President may, in case of rebellion or invasion, or imminent danger thereof, place the whole or any part of the Republic under martial law, the President alone is to decide whether the exigency is such as to require martial law, and how long martial law when proclaimed shall continue in force; and his decision is not subject to review by the courts.

Under martial law, in case of insurrection, the military commander may do whatever, in accordance with the customs and usages of war, he may deem necessary or proper for the suppression of the insurrection and the restoration of peace, and his acts cannot be called in question by the courts except in case of an abuse of power.

Under martial law, if necessary, in the opinion of the military commander, for the restoration of peace, a civilian may be tried by a military commission for misprision of treason.

Such trial may take place after actual hostilities have ceased and while the civil courts are in session, if there is still a state of war, and an impediment to such trials in the civil courts.

Misprision of treason, if committed, is not necessarily completed before an actual outbreak or the proclamation of martial law.

Notwithstanding a reservation in a proclamation of martial law that the civil courts would continue to conduct ordinary business, a person may, if necessary in the opinion of the President, be tried by a military commission.

The President may delegate to a Judge Advocate the power to bring a person before a military commission for trial.

The petition, filed May 20, 1895, and addressed to the Chief Justice, is as follows:

The petition of J. C. Kalanianaole respectfully shows:

That he is a resident of Honolulu, Island of Oahu, and is unlawfully and unjustly restrained of his liberty and imprisoned by one James A. Low, in Oahu Prison, at said Honolulu, Island of Oahu, by virtue of a pretended commitment or order in words and figures following, to wit:

General Headquarters, National Guard of Hawaii,
Honolulu, Island of Oahu, H. I., March 8, 1895.
General Court Martial Orders, No. 175.

I.   Before a Military Commission, which convened at Honolulu, Island of Oahu, January 17, 1895, pursuant to Special Orders No. 25, dated January 16, 1895, as amended by Special Orders No. 31, dated January 16, 1895, from these Headquarters, of which Colonel William Austin Whiting, 1st Regiment, N. G. H., was President, were arraigned and tried Jonah Kalanianaole.

CHARGE :—MISPRISON OF TREASON, for that the said Jonah Kalanianaole, at Honolulu, in the Island of Oahu, one of the Hawaiian Islands, while owing allegiance to the Republic of Hawaii, at various times within three months now last past, had knowledge of the commission of treason against the

Republic of Hawaii, and the Government thereof, and having such knowledge concealed the same, and did not as soon as might be disclose and make known the same to some member of the Executive Council, or to some Judge of a Court of Record, or to the Marshal, or to some Sheriff or Deputy Sheriff.

FIRST SPECIFICATION:—That one Samuel Nowlein, at Honolulu, in the Island of Oahu, one of the Hawaiian Islands, while owing allegiance to the Republic of Hawaii, at divers times within three months now last past, did conspire with divers other persons to overthrow, put down and destroy, by force, the Republic of Hawaii, and the Government thereof, and to levy war against it, and to oppose by force, the authority thereof; and in pursuance of said conspiracy, and in effectuating and carrying out the same did, together with certain of his co-conspirators aforesaid, commit treason against the Republic of Hawaii, and the Government thereof, and *did cause fire-arms to be sent from a foreign country for the purpose of being landed on said Island of Oahu, there to be used to levy war* against the Republic of Hawaii, and Government thereof, and that the said Jonah Kalanianaole, while owing allegiance to the Republic of Hawaii, and having knowledge of the commission of said treason, and of the various matters in this specification alleged, *concealed the same,* and did not as soon as might be disclose and make known the same to some member of the Executive Council, or to some Judge of a Court of Record, or to the Marshal, or to some Sheriff or Deputy Sheriff.

SECOND SPECIFICATION:—That the said Samuel Nowlein, at Honolulu, in the Island of Oahu one of the Hawaiian Islands, while owing allegiance to the Republic of Hawaii, at divers times within three months now last past, did conspire with divers other persons to overthrow, put down and destroy, by force, the Republic of Hawaii, and the Government thereof, and to levy war against it, and to oppose by force the authority thereof; and in pursuance of said conspiracy and in effectuating and carrying out the same, did commit treason

against the Republic of Hawaii, and the Government thereof, and together with certain of his co-conspirators aforesaid, *did dispatch a vessel from the port of Honolulu in said Island of Oahu, to procure fire-arms with which to levy war*, on said Island of Oahu, against the Republic of Hawaii, and the Government thereof, and to effectuate and carry out the purposes of said conspiracy, and that the said Jonah Kalanianaole, while owing allegiance to the Republic of Hawaii, and having knowledge of the commission of said treason, and of the various matters in this specification alleged, concealed the same, and did not as soon as might be disclose and make known the same to some member of the Executive Council, or to some Judge of a Court of Record, or to the Marshal, or to some Sheriff or Deputy Sheriff.

THIRD SPECIFICATION:—That the said Samuel Nowlien, at Honolulu, in the Island of Oahu, one of the Hawaiian Islands, while owing allegiance to the Republic of Hawaii, at divers times within three months now last past, did conspire with divers other persons to overthrow, put down and destroy, by force, the Republic of Hawaii, and the Government thereof, and to levy war against it, and to oppose, by force, the authority thereof; and in pursuance of said conspiracy, and in effectuating and carrying out the same, did commit treason against the Republic of Hawaii, and the Government thereof, and together with certain of his co-conspirators aforesaid, *did dispatch a vessel to procure fire-arms with which to levy war* against the Republic of Hawaii, and the Government thereof; and to effectuate and carry out the purposes aforesaid of said conspiracy, *which said fire-arms were taken aboard said vessel,* and that the said Jonah Kalanianaole, while owing allegiance to the Republic of Hawaii, and having knowledge of the commission of said treason, and of the various matters in this specification alleged, concealed the same, and did not as soon as might be disclose and make known the same to some member of the Executive Council, or to some Judge of a Court of Record, or to the Marshal, or to some Sheriff or Deputy Sheriff.

FOURTH SPECIFICATION :—That the said Samuel Nowlein, at Honolulu, in the Island of Oahu, one of the Hawaiian Islands, while owing allegiance to the Republic of Hawaii, at divers times within three months now last past, did conspire with divers other persons to overthrow, put down and destroy, by force, the Republic of Hawaii, and the Government thereof, and to levy war against it, and to oppose by force the authority thereof, and in pursuance of said conspiracy, and in effectuating and carrying out the same, did commit treason against the Republic of Hawaii, and the Government thereof, and together with certain of his co-conspirators aforesaid, *did procure fire-arms with which to levy war against the Republic of Hawaii*, and the Government thereof, and to effectuate and carry out the purpose aforesaid of said conspiracy, and that the said Jonah Kalanianaole, while owing allegiance to the Republic of Hawaii, and having knowledge of the commission of said treason, and of the various matters in this specification alleged, concealed the same, and did not as soon as might be disclose and make known the same to some member of the Executive Council, or to some Judge of a Court of Record, or to the Marshal, or to some Sheriff or Deputy Sheriff.

FIFTH SPECIFICATION :—That the said Samuel Nowlein, at Honolulu, in the Island of Oahu, one of the Hawaiian Islands, while owing allegiance to the Republic of Hawaii, at divers times within three months now last past, did conspire with divers other persons to overthrow, put down and destroy, by force, the Republic of Hawaii, and the Government thereof, and to levy war against it, and to oppose by force the authority thereof, and in pursuance of said conspiracy, and in effectuating and carrying out the same, did commit treason against the Republic of Hawaii, and the Government thereof, and together with certain of his co-conspirators aforesaid, *did obtain and procure men to levy war against the Republic of Hawaii*, and the Government thereof, and to effectuate and to carry out the purposes aforesaid of said conspiracy, and that the said Jonah

Kalanianaole, while owing allegiance to the Republic of Hawaii, and having knowledge of said treason, and of the various matters in this specification alleged, concealed the same and did not as soon as might be disclose and make known the same to some member of the Executive Council, or to some Judge of a Court of Record, or to the Marshal, or to some Sheriff or Deputy Sheriff.

SIXTH SPECIFICATION:—That the said Samuel Nowlein, at Honolulu in the Island of Oahu, one of the Hawaiian Islands, while owing allegiance to the Republic of Hawaii, at divers times within three months now last past, did conspire with divers other persons to overthrow, put down and destroy, by force, the· Republic of Hawaii, and the Government thereof, and to levy war against it, and to oppose by force the authority thereof, and in pursuance of said conspiracy and in effectuating and carrying out the same, did commit treason against the Republic of Hawaii, and the Government thereof, and together with certain of his co-conspirators aforesaid, *did partially establish a pretended government and a military force, and did appoint and procure certain officers and agents for said pretended government and military force aforesaid*, and that the said Jonah Kalanianaole, while owing allegiance to the Republic of Hawaii, and having knowledge of the commission of said treason, and of the various matters in this specification alleged, concealed the same and did not as soon as might be disclose and make known the same to some member of the Executive Council, or to some Judge of a Court of Record, or to the Marshal, or to some Sheriff or Deputy Sheriff.

SEVENTH SPECIFICATION :—That the said Samuel Nowlein, at Honolulu, in the Island of Oahu, one of the Hawaiian ian Islands, while owing allegiance to the Republic of Hawaii, at divers times, within three months now last past, did conspire with divers other persons to overthrow, put down and destroy, by force, the Republic of Hawaii, and the Government thereof, and to levy war against it, and to oppose by force the authority

thereof, and in pursuance of said conspiracy, and in effectuating and carrying out the same, *did procure, counsel, incite, command and hire others to commit treason against the Republic of Hawaii*, and the Government thereof, *and to cause fire-arms to be sent from a foreign country* for the purpose of being landed on said Island of Oahu, there *to be used to levy war against the Republic of Hawaii*, and the Government thereof, and that the said Jonah Kalanianaole, while owing allegiance to the Republic of Hawaii, and having knowledge of the commission of said treason, and of the various matters in this specification alleged, concealed the same, and did not as soon as might be disclose and make known the same to some member of the Executive Council, or to some Judge of a Court of Record, or to the Marshal, or to some Sheriff or Deputy Sheriff.

EIGHTH SPECIFICATION :—That the said Samuel Nowlein, at Honolulu, in the Island of Oahu, one of the Hawaiian Islands, while owing allegiance to the Republic of Hawaii, at divers times within three months now last past, did conspire with divers other persons to overthrow, put down and destroy, by force the Republic of Hawaii, and the Government thereof, and to levy war against it, and to oppose by force the authority thereof, and in pursuance of said conspiracy, and in effectuating and carrying out the same, *did· procure, counsel, incite, command and hire others to commit treason against the Republic of Hawaii*, and the Government thereof, *and to dispatch a vessel from the port of Honolulu*, in said Island of Oahu, *to procure fire-arms with which to levy war* on the said Island of Oahu, against the Republic of Hawaii, and the Government thereof, and that the said Jonah Kalanianaole, while owing allegiance to the Republic of Hawaii, and having knowledge of the commission of such treason, and of the various matters in this specification alleged, concealed the same, and did not as soon as might be disclose and make known the same to some member of the Executive Council, or to some Judge of a Court of Record, or to the Marshal, or to some Sheriff or Deputy Sheriff.

NINTH SPECIFICATION :—That the said Samuel Nowlein, at Honolulu, in the Island of Oahu, one of the Hawaiian Islands, while owing allegiance to the Republic of Hawaii, at divers times within three months now last past, did conspire with divers other persons to overthrow, put down and destroy, by force, the Republic of Hawaii, and the Government thereof, and to levy war against it, and to oppose by force the authority thereof, and in pursuance of said conspiracy, and in effectuating and carrying out the same, *did procure, counsel, incite, command and hire others to commit treason* against the Republic of Hawaii, and the Government thereof, *and to dispatch a vessel to procure fire-arms with which to levy war* against the Republic of Hawaii, and the Government thereof, *which said fire-arms were taken aboard said vessel,* and that the said Jonah Kalanianaole, while owing allegiance to the Republic of Hawaii, and having knowledge of the commission of said treason, and of the various matters in this specification alleged, concealed the same, and did not as soon as might be disclose and make known the same to some member of the Executive Council, or to some Judge of a Court of Record, or to the Marshal, or to some Sheriff or Deputy Sheriff.

TENTH SPECIFICATION :—That the said Samuel Nowlein, at Honolulu, in the Island of Oahu, one of the Hawaiian Islands, while owing allegiance to the Republic of Hawaii, at divers times within three months now last past, did conspire with divers other persons to overthrow, put down and destroy, by force, the Republic of Hawaii, and the Government thereof and to levy war against it, and to oppose by force the authority thereof, and in pursuance of said conspiracy and in effectuating and carrying out the same *did procure, counsel, incite, command and hire others to commit treason* against the Republic of Hawaii, and the Government thereof, *to procure fire-arms with which to levy war* against the Republic of Hawaii, and the Government thereof, and that the said Jonah Kalanianaole, while owing allegiance to the Republic of Hawaii, and having

knowledge of the commission of said treason, and of the various matters in this specification alleged, concealed the same, and did not as soon as might be disclose and make known the same to some member of the Executive Council, or to some Judge of a Court of Record, or to the Marshal, or to some Sheriff or Deputy Sheriff.

ELEVENTH SPECIFICATION:—That the said Samuel Nowlein, at Honolulu, in the Island of Oahu, one of the Hawaiian Islands, while owing allegiance to the Republic of Hawaii, at divers times within three months now last past, did conspire with divers other persons to overthrow, put down and destroy by force, the Republic of Hawaii and the Government thereof, and to levy war against it, and to oppose by force the authority thereof, and in pursuance of said conspiracy and in effectuating and carrying out the same *did procure, counsel, incite, command and hire others to commit treason* against the Republic of Hawaii and the Government thereof, *and to obtain and procure men to levy war* against the Republic of Hawaii and the Government thereof, and that the said Jonah Kalanianaole, while owing allegiance to the Republic of Hawaii, and having knowledge of the commission of said treason and of the various matters in this specification alleged, concealed the same and did not as soon as might be disclose and make known the same to some member of the Executive Council, or to some Judge of a Court of Record, or to the Marshal, or to some Sheriff or Deputy Sheriff.

TWELFTH SPECIFICATION:—That the said Samuel Nowlein, at Honolulu, in the Island of Oahu, one of the Hawaiian Islands, while owing allegiance to the Republic of Hawaii, at divers times within three months now last past, did conspire with divers other persons to overthrow, put down and destroy, by force, the Republic of Hawaii, and the Government thereof, and to levy war against it, and to oppose by force the authority thereof; and, in pursuance of said conspiracy, and effectuating and carrying out the same, *did procure, counsel, incite, com-*

*mand and hire others to commit treason* against the Republic of Hawaii, and the Government thereof, *and to partially establish a pretended government and a military force, and to appoint and procure certain officers and agents for said pretended government and military force* aforesaid; and that the said Jonah Kalanianaole, while owing allegiance to the Republic of Hawaii, and having knowledge of the commission of said treason, and of the various matters in this specification alleged, concealed and did not as soon as might be disclose and make known the same to some member of the Executive Council, or to some Judge of a Court of Record, or to the Marshal, or to some Sheriff or Deputy Sheriff.

THIRTEENTH SPECIFICATION:—That the said Samuel Nowlein, at Honolulu, in the Island of Oahu, one of the Hawaiian Islands, while owing allegiance to the Republic of Hawaii, at divers times within three months now last past, did conspire with divers other persons to overthrow, put down and destroy, by force, the Republic of Hawaii, and the Government thereof; and to levy war against it, and to oppose by force the authority thereof; and, in pursuance of said conspiracy, and in effectuating and carrying out the same, *did procure, counsel, incite, command and hire others to commit treason* against the Republic of Hawaii, and the Government thereof, and to *levy war against the Republic of Hawaii,* and the Government thereof, and that the said Jonah Kalanianaole, while owing allegiance to the Republic of Hawaii, and having knowledge of the commission of said treason, and of the various matters in this specification alleged, concealed the same, and did not as soon as might be disclose and make known the same to some member of the Executive Council, or to some Judge of a Court of Record, or to the Marshal, or to some Sheriff, or Deputy Sheriff.

To which charge and specifications, the accused Jonah Kalanianaole declined to plead, and the President of the Commission directed that a plea of Not Guilty be entered to each of the specifications and to the charge.

FINDINGS.

The Commission, after having maturely considered the evidence adduced in this case, finds the accused Jonah Kalanianaole as follows:

Of the First Specification ............Not Guilty
Of the Second Specification ...........Not Guilty
Of the Third Specification ...........Not Guilty
Of the Fourth Specification ...........· .... Guilty
Of the Fifth Specification ...............Guilty
Of the Sixth Specification ............Not Guilty
Of the Seventh Specification ..........Not Guilty
Of the Eighth Specification ...........Not Guilty
Of the Ninth Specification............Not Guilty
Of the Tenth Specification ...............Guilty
Of the Eleventh Specification .....·........Guilty
Of the Twelfth Specification ...........Not Guilty
Of the Thirteenth Specification ...........Guilty
Of the Charge .......................Guilty

SENTENCE.

And the Commission does sentence the accused Jonah Kalanianaole; to be·imprisoned at hard labor for the term of One Year, at such place as the Commander-in-Chief may direct, and to pay a fine of One Thousand Dollars ($1,000), said imprisonment to date from the 11th day of February, A. D. 1895.

II.    The proceedings of the Commission in the foregoing case were duly forwarded to the President of the Republic of Hawaii and Commander-in-Chief of the military force of the Republic.

III.    The proceedings, findings and sentence in the case of Jonah Kalanianaole are hereby approved; but the said sentence is modified as follows: that the said Jonah Kalanianaole be imprisoned at hard labor for the term of One Year, at the Oahu Jail, or any other jail or prison of the Republic, and to pay a

fine of One Thousand Dollars ($1000), said imprisonment to date from the 11th day of February A. D. 1895, and be imprisoned at hard labor until said fine is paid.

The Marshal or his Deputy is ordered to take the said Jonah Kalanianaole into his custody and to cause the said sentence against him to be executed by imprisonment at hard labor for the term designated in the said sentence, and thereafter until the said fine shall be fully paid, at the Oahu Jail, or any other jail or prison of the Republic.

SANFORD B. DOLE,<br>
<i>President and Commander-in-Chief.</i>

That your petitioner is of the age of 24 years and was born in the then Kingdom of Hawaii, and has ever since his birth resided in the Hawaiian Islands.

That petitioner at the times hereinafter stated, was not, nor has he ever been, nor is he now in the military or naval service of the Republic of Hawaii.

That on Tuesday, the 8th day of January, 1895, this petitioner was arrested without a warrant, by order of irresponsible persons whom petitioner cannot name, and from that time was closely confined in prison.

That on the 11th day of February, A. D. 1895, the petitioner was forcibly carried before a Military Commission convened at Honolulu by order of Sanford B. Dole, Commander-in-Chief of the Hawaiian Military and arraigned before said Commission on the charge of Misprision of Treason.

That petitioner objected to the authority and the jurisdiction of the Commission appointed to try him upon the said charge; but his objections were overruled and he was ordered to plead to said charge which petitioner declined to do.

That said Commission proceeded to try the petitioner and condemned him to imprisonment at hard labor for the period of one year and to pay a fine of One Thousand Dollars, which sentence petitioner is informed and believes was approved by the said S. B. Dole on the 8th day of March, 1895.

Your petitioner further avers that during all the times stated the regular Courts of the Republic were in session and the Attorney-General of the Republic was actually appointed and acting *de jure*; but that no prosecution was instituted against petitioner for the pretended crime imputed to him, and petitioner is restrained of his liberty and imprisoned by virtue of said proceedings and on the order of the said Commission and not otherwise.

Your petitioner claims that said Military Commission had no jurisdiction or authority legally to try, convict and sentence him in the manner and form above stated.

Wherefore your petitioner prays that a writ of Habeas Corpus may be granted directed to the said James A. Low, commanding him to have the body of petitioner before your Honor at a time and place therein specified to do, receive and submit to what shall there and then be considered by your Honor concerning him with this writ and that petitioner may be discharged from custody and be restored to his liberty.

---

The writ was allowed and issued returnable at a Special Term of this Court held May 22, 1895, at which date the respondent made the following

## RETURN.

James A. Low, Jailer of Oahu Prison, at Honolulu, Island of Oahu, the defendant in the above mentioned writ, for return thereto respectfully states that it is true that the said Jonah Kalanianaole is confined and restrained of his liberty by the said James A. Low; but the said James A. Low alleges that the said Jonah Kalanianaole is so restrained lawfully, by virtue of a certain commitment or order signed by Sanford B. Dole, President of the Republic of Hawaii, and Commander-in-Chief of the Military forces of the Republic, in words and form as set forth in paragraph I. of the petition of petitioner herein, the same being a copy of General Court Martial Orders No. 175, dated March 8, 1895.

And said James A. Low hereby further states that on the 7th of January A. D., 1895 there existed in said Honolulu a rebellion against the Government of the Republic, and the public safety requiring it, the said Sanford B. Dole, President of the Republic of Hawaii, did in pursuance of the authority vested in him by the Constitution and laws of the Republic of Hawaii, on the said 7th day of January, at said Honolulu, issue a proclamation suspending the privilege of the writ of Habeas Corpus and placing the said Island of Oahu under Martial Law, a copy of which proclamation is hereunto attached marked Exhibit "A" and made a part hereof.

That on the 16th day of January, A. D., 1895, the said Sanford B. Dole, President and Commander-in-Chief as aforesaid, by Special Order No. 25, did order a Military Commission consisting of the persons named therein, to convene at said Honolulu on the 17th day of said January and thereafter from day to day, for the trial of such prisoners as might be brought before it on the charges and specifications to be presented by the Judge Advocate, a copy of which order is hereunto attached and made a part hereof and marked Exhibit "B."

That on the 11th day of February, 1895, by Special Order No. 31, it was ordered by the said Sanford B. Dole, President and Commander-in-Chief as aforesaid, that Captain A. G. M. Robertson should act as Judge Advocate on the said Military Commission, vice Captain W. A. Kinney, relieved from such duty; a copy of which Special Order No. 31 is hereto attached and made a part hereof and marked Exhibit "C."

That in pursuance of such Special Order No. 25 and Special Order No. 31 the said Captain A. G. M. Robertson, Judge Advocate did on the 11th day of February, 1895, present before the said Military Commission a charge and specifications against the said Jonah Kalanianaole, charging him with Misprision of Treason, in the words and figures set forth in the said General Court Martial Orders No. 175.

That the said Military Commission did then and there proceed

to try the said Jonah Kalanianaole upon such charge, and after hearing the evidence of witnesses and the argument of counsel for the accused and of the Judge Advocate did find the said Jonah Kalanianaole guilty of the said charge made against him and sentenced him, which sentence was subsequently approved and modified by the said Sanford B. Dole, President and Commander-in-Chief as aforesaid, who then and there ordered the Marshal or his deputy to execute such sentence as so modified at the Oahu Jail or any other jail or prison of the Republic, all of which more fully appears in the said General Court Martial Orders No. 175 contained in the said first section of the petition herein.

That during all of the time between the said seventh day of January up to the 18th day of March, 1895, by the order and authority of the said Sanford B. Dole, President and Commander-in-Chief as aforesaid, martial law was in force in said Island of Oahu and was so in force at the time of the aforesaid trial, conviction and sentence of the said Jonah Kalanianaole.

That the said James A. Low denies that during the said period during which martial law was in force as aforesaid, the regular courts of the Republic were in session in said Honolulu.

That in pursuance of such sentence and order contained in said General Court Martial Orders No. 175 and in compliance with the law, the Marshal of the Republic did thereupon proceed to execute the said sentence in manner and form as in said order set forth and directed, and did thereupon imprison the said Jonah Kalanianaole in said Oahu Jail and place him in the custody of the said James A. Low, the lawful jailor of said Oahu Jail, in which jail and custody he now lawfully remains in pursuance of the terms of such order.

And the defendant submits that the aforesaid trial, conviction, sentence and order and that the aforesaid imprisonment of the petitioner were and are lawful and were and are authorized and justified under the Constitution and laws of the Republic of Hawaii.

(The exhibits referred to in the return are sufficiently stated in substance in the pleadings and opinion of the Court. The briefs of counsel were, with the pleadings and opinion of the Court, published in full in pamphlet form by the Hawaiian Gazette Company, Honolulu, 1895, pp. 208.)

### OPINION OF THE COURT, BY FREAR, J.

The facts out of which this case arose and of which the Court takes notice, either as set forth in the pleadings or as being matters of common historical knowledge, and for the most part referred to in the arguments and briefs of counsel, are substantially as follows:

On the evening of the 6th of January last an insurrection broke out in the suburbs of Honolulu, the object of which was the overthrow of the Republic and the restoration of the Monarchy. The full extent of the conspiracy is unknown, but it was carefully planned and was evidently deemed by its leaders to be sufficient in numbers and equipment for the successful accomplishment of its purposes. Its numbers undoubtedly ran into the hundreds and included the ex-Queen and other prominent persons of various nationalities. The equipment consisted chiefly of 288 rifles and 80 revolvers imported secretly from San Francisco, besides bombs manufactured and firearms collected here.

The community was at once thrown into great uncertainty and excitement. Ordinary business ceased; the courts were closed. In addition to the regular and volunteer forces, nearly all of the more prominent residents were engaged in active military and police service as Citizens' Guards, day and night. Engagements took place between the government forces and the insurgents on Sunday, the 6th, and on Monday and Wednesday following, mostly at long range, and with but little loss, the wounded numbering five, and the killed, three, one of whom was shot by mistake. On the 14th, the eighth day after the outbreak, the principal leaders were captured, and on the 17th, the eleventh day after the outbreak, the last of the leaders was

taken; some subordinates were not captured until later still. In the course of a week or so after the uprising, residents not engaged in the regular forces returned to their various ordinary pursuits. The courts, however, were not so soon restored to the unobstructed exercise of their jurisdiction. The Circuit Court of the First Circuit, for instance, which is the court of general original jurisdiction for the Island of Oahu, and in which cases of treason and misprision of treason arising on this Island would ordinarily be tried, did little business of any kind and held no trials (indeed, no jury was summoned), as it would, but for the insurrection, have done at the regular term which by law should have been held during the four weeks beginning February 4th and ending March 2d.

On the morning after the outbreak, the 7th of January, the President, by proclamation, suspended the privilege of the writ of *habeas corpus* and placed the Island of Oahu under martial law, to continue until further notice, during which time, however, the courts were to conduct ordinary business as usual, except as aforesaid.

The petitioner was arrested on the 8th of January.

On the 16th, by a special order of the President as Commander-in-Chief, a Military Commission was ordered to meet on the 17th and thereafter from day to day for the trial of such prisoners as might be brought before it on charges and specifications to be presented by the Judge Advocate.

Nearly two hundred prisoners were tried by this Commission on charges of treason and misprision of treason. Among them was the petitioner, a nephew of Queen-Dowager Kapiolani, a civilian not connected with the military forces, who, on the 11th of February, was brought before the Commission on a charge and thirteen specifications of misprision of treason. He was found guilty of the charge and five specifications, the gist of which is that, "while owing allegiance to the Republic of Hawaii," he had "knowledge" and "concealed the same," that certain other persons, owing such allegiance, did "within three months now last past," "conspire" together "to overthrow and

destroy by force the Republic," and "to levy war against it" and "to oppose by force the authority thereof," and that in "pursuance of said conspiracy and in effectuating the same" the conspirators "did commit treason against the Republic" and did themselves "procure men to levy war against the Republic" and "firearms with which to levy war against it," and "procure, counsel, incite, command and hire others to commit treason," and "levy war against the Republic" and to "procure firearms" and "men" for that purpose.

The Commission sentenced the petitioner to imprisonment at hard labor for one year, and to pay a fine of one thousand dollars, which sentence, with a slight modification, was approved by the President, who, on the 8th of March, ordered the Marshal or his deputy to execute the same, and it is in pursuance of this order that the respondent now holds the petitioner.

The Commission practically completed its labors in the early part of March, and on the 18th, by proclamation of the President, the privilege of the writ of *habeas corpus* was restored and martial law terminated.

On the 20th of May the petitioner applied for this writ of *habeas corpus*.

The Commission consisted of seven officers of the regular and volunteer forces, besides the Judge Advocate, and was presided over by the Colonel of the National Guard of Hawaii, who up to that date had been First Judge of the Circuit Court of the First Circuit, but had resigned his judgeship.

The charge was of a statutory offense, and the sentence imposed was within the statutory penalty.

It is conceded, or at least there is not even a pretense to the contrary, that the findings and sentence of the Commission were fully sustained by the evidence, that the procedure followed was that usual in trials before military commissions, and that the accused was allowed the ordinary privileges (except that of trial by jury in the ordinary courts) of defendants in criminal proceedings, such as ample notice of the charge against him, the

benefit of counsel, the right to meet the witnesses produced against him, face to face, and to cross-examine them, to produce witnesses and proofs in his own behalf, to be heard in his own defense, not to be compelled to give evidence against himself, and the benefit of reasonable doubt.

The sole ground upon which the petitioner seeks to regain his liberty is that the military commission was without jurisdiction to try the case.

In support of this contention it is urged: that a military commission cannot try a civilian for any offense other than an offense against the laws of war, and that misprision of treason is not such an offense; that a military commission cannot try, as is alleged to have been done in this instance, any case whatever after active hostilities have ceased, or while the ordinary courts are in session; that a military commission cannot try an offense completed before an actual outbreak and the consequent proclamation of martial law, and that misprision of treason, if committed, must necessarily have been completed before such time; that the offense of misprision of treason was taken out of the jurisdiction of the military commission in question by the clause of the Proclamation which saved to the regular courts the power to conduct ordinary business; and that the Commander-in-Chief could not, as he is alleged to have done in this case, delegate the power of arraignment to the Judge Advocate.

The respondent justifies the trial, conviction, sentence, order and imprisonment by martial law.

Has martial law a place under the Constitution of this Republic? If so, what is it, what acts does it authorize, when, where and by whom may it be enforced, and who is arbiter of these questions?

The Constitution provides as follows:

"Article 31. Martial Law. Suspension of *Habeas Corpus.*

"The President, or one of the Cabinet Ministers as herein provided, may, in case of rebellion or invasion, or imminent

danger of rebellion or invasion, when the public safety requires it, suspend the privilege of the writ of *habeas corpus,* or place the whole or any part of the Republic under martial law."

This article of the Constitution, whether considered as a grant, or limitation, or declaration of power, certainly covers all the authority, if any, that is or reasonably can be set up on behalf of the respondent in this case.    Of the questions above enumerated as involved in this case, this article expressly settles: (1), that martial law is recognized by the Constitution; (2), that the President may put it in force; and (3), that it may be in force only when there is such rebellion or invasion, or imminent danger thereof, that the public safety requires it.

Our present Constitution is not anomalous in these respects.

The power to declare martial law was expressly provided for in the Hawaiian Constitutions of 1852, 1864 and 1887, under the Monarchy; it is also expressly recognized in the Constitutions of New Hampshire, Massachusetts, South Carolina and Rhode Island (Stimson, Am. St. Law. Sec. 293), and under the name of *etat de siege,* in the laws of France and other continental European countries (Birkhimer, Mil. Gov't and Mar. Law, 11, 302).    In the United Kingdom, the British Colonies and the United States, where it is not expressly provided for, it is, with practical unanimity, even on the part of the most conservative courts and writers, regarded as an existing and necessary power, and has frequently been exercised in those countries.

The theory on which it is based is not, as sometimes stated, that necessity authorizes a breach of the Constitution, or that a great and sudden emergency which requires quick action may render it necessary to override the constitutional safeguards of life, liberty and property, but that necessity makes that lawful which would otherwise be unlawful, as expressed in the familiar maxims: *salus populi suprema lex; necessitas publica major est quam privata; inter arma silent leges;* the right of self-preservation is the first law of nations as it is of individuals; in other words, that necessity is only another name for a change

of circumstances, and that the law applicable to one set of circumstances is not applicable to an essentially different set of circumstances.   Expressed in another way, the Constitution itself provides for a state of war as well as a state of peace, and martial law, the law of war, is the law applicable to a state of war.   See *Ex parte Milligan*, 4 Wall., 121, 127, 137, 139, 140; *Griffin v. Wilcox*, 21 Ind. 378; Pomeroy, Mun. Law, Secs. 694 *et seq.*; Prof. Parker in N. Am. Rev., Oct., 1861.

As to the person or body by whom martial law may be put in force:—In the British Empire, since the Petition of Right, 1528, martial law has been instituted by Parliament, as in Ireland in 1803 and 1833; by the Irish Parliament, as in 1799; and by a Colonial Parliament, as in Jamaica in 1865; but the usual course has been for the military authorities to enforce such law, without previous authority, and subject to ratification afterwards by Parliament or the Colonial legislative body by Act of Indemnity.  *Phillips v. Eyre*, L. R. 4 Q. B. 243; *Ib.* L. R. 6 Q. B. 1; 1 Stephen, Hist. Cr. L. 210.   In the United States there is considerable difference of opinion as to the proper source from which a proclamation of martial law should emanate, but as matter of fact, this authority has been exercised by the President as Commander-in-Chief, as in Kentucky in 1865; by his subordinates, as by Major-General Fremont in St. Louis in 1861; by Congress, as by the Reconstruction Acts of 1867; by a State Legislature, as in Rhode Island in 1842; and by a Territorial Governor, as in Washington Territory in 1856, and again in 1885-6.  Birkhimer, *supra, passim.*

As to when martial law may be enforced, it was said, *obiter*, in *Ex parte Milligan*, 4 Wall. 127, that "martial law cannot arise from a *threatened* invasion."   This remark was entirely uncalled for by the facts of the case, but was, nevertheless, followed, though unnecessarily, in *Milligan v. Hovey*, 3 Biss. 17. It is, however, opposed to the reasoning of the Court in *Martin v. Mott*, 12 Wh. 19, and has been practically ignored in subsequent decisions of the same Court and is criticised as erroneous

by those who uphold the greater portion of the much disputed opinion of the Court in *Ex parte Milligan.* Hare, Am. Const. Law, 964; Birkhimer, *supra,* 351. Our Constitution places this question beyond doubt by expressly providing that imminent danger of, as well as actual rebellion or invasion, is sufficient to justify the enforcement of martial law when the public safety requires it.

But there are other questions not so clearly settled by Article 31 of the Constitution. These, so far as pertinent to the present case, are, first, was there such rebellion or imminent danger thereof as to require the exercise of martial law, and who is judge of this question? Secondly, what is the scope of martial law, and, more particularly, did it authorize the trial of the petitioner by military commission?

First, by the proper construction of Article 31 the President is made the sole judge of the exigencies of the case.

In *Vanderheyden v. Young,* 11 Johns. 150, the Supreme Court of New York, in passing upon the validity of a trial by court-martial, had occasion to construe a statute of the United States which authorized the President to call forth the militia in case of invasion or imminent danger thereof. The Court held that the President was sole judge of the exigencies of the case.

In *Martin v. Mott,* 12 Wh. 19, the Supreme Court of the United States, in construing the same statute for the same purpose, said, per Mr. Justice Story:

"The power thus confided by congress to the President is, doubtless, of a very high and delicate nature. A free people are naturally jealous of the exercise of military power; and the power to call the militia into actual service is certainly felt to be one of no ordinary magnitude. But it is not a power which can be executed without a correspondent responsibility. It is, in its terms, a limited power, confined to cases of actual invasion, or of imminent danger of invasion. If it be a limited power, the question arises by whom is the exigency to be judged of and

decided? Is the President the sole and exclusive judge whether the exigency has arisen, or is it to be considered as an open question, upon which every officer to whom the orders of the President are addressed, may decide for himself, and equally open to be contested by every militiaman who shall refuse to obey the orders of the President? We are all of opinion that the authority to decide whether the exigency has arisen belongs exclusively to the President, and that his decision is conclusive upon all other persons. We think this construction necessarily results from the nature of the power itself, and from the manifest object contemplated by the act of congress. The power itself is to be exercised upon sudden emergencies, upon great occasions of State, and under circumstances which may be vital to the existence of the Union. A prompt and unhesitating obedience to orders is indispensable to the complete attainment of the object. The service is a military service, and the command of a military nature; and in such cases, every delay, and every obstacle to an efficient and immediate compliance, necessarily tend to jeopard the public interests. * * * Whenever a statute gives a discretionary power to any person to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the sole and exclusive judge of those facts. * * * It is no answer that such power may be abused, for there is no power which is not susceptible of abuse. The remedy for this, as well as for all other official misconduct, if it should occur, is to be found in the Constitution itself. In a free government the danger must be remote, since in addition to the high qualities which the Executive must be presumed to possess, of public virtue, and honest devotion to the public interests, the frequency of elections, and the watchfulness of the representatives of the nation, carry with them all the checks which can be useful to guard against usurpation or wanton tyranny."

In *Luther v. Borden,* 7 How. 1, the same Court, but of an entirely different *personnel,* in passing upon another section of the same statute, which provided for the calling out of the

militia in case of an insurrection in a State, said, per Chief Justice Taney:

"After the President has acted and called out the militia, is a circuit court of the United States authorized to inquire whether his decision was right? Could the court, while the parties were actually contending in arms for the possession of the government, call witnesses before it, and inquire which party represented a majority of the people? If it could, then it would become the duty of the court (provided it came to the conclusion that the President has decided incorrectly) to discharge those who were arrested or detained by the troops in the service of the United States, or the government which the President was endeavoring to maintain. If the judicial power extends so far, the guarantee contained in the constitution of the United States is a guarantee of anarchy, and not of order. Yet if this right does not reside in the courts when the conflict is raging—if the judicial power is, at that time, bound to follow the decision of the political, it must be equally bound when the contest is over. It cannot, when peace is restored, punish as offenses and crimes the acts which it before recognized, and was bound to recognize, as lawful."

On the question of the policy of removing such matters from the jurisdiction of courts, see further, *Phillips v. Eyre, supra*, at pages 16, 17, and 1 Bish. Cr. L. Secs. 67, 68.

Again the Constitution of the United States provides that "The privilege of the writ of *habeas corpus* shall not be suspended, unless when in case of rebellion or invasion the public safety may require it." There has been much diversity of opinion as to whether the suspension may be made by the President or by Congress, but it has never been questioned, we believe, that the President or Congress, in either case, is sole judge of the circumstances under which the power shall be exercised. For instance, Chief Justice Taney, in *Ex parte Merryman*, Taney, 257, in an elaborate opinion in which he portrayed the dangerous nature of such power, but found that Congress possessed it, admitted that, "it is true that in the cases

mentioned, Congress is, of necessity, the judge of whether the public safety does or does not require it; and their judgment is conclusive." Similarly, in *Ex parte Field*, 5 Blatch, 63, the Court held that the President had this power, and refused to interfere with its enforcement in Vermont, a loyal state, five hundred miles from the seat of war, saying, "that this is a question for the President, not for the court to determine."

The introduction of the words limiting the exercise of the power to cases of invasion or rebellion, or imminent danger thereof, when the public safety requires it, is here, as Chief Justice Taney said of Congress there, a standing admonition to the President of the danger of exercising the power, and of the extreme caution he should observe before assuming such power over the liberty of a citizen, but that he is sole judge of the occasion, there can be no question.

Thus, as we have seen, where there is an express grant or recognition of power, the person upon whom it is conferred is sole judge of the necessity of exercising it. And it is obvious that by the same reasoning, the President is sole judge of the time during which martial law shall continue as well as of the necessity for proclaiming it in the first instance.

In thus holding, we do not wish to be understood as of the opinion that the circumstances of this case would not have justified the proclamation of martial law, were there no express constitutional provision authorizing it. On the contrary, the rulings of the United States courts would seem fully to justify such a course, as an incident of general war power, or on the ground of necessity. It is true that in both the State and Federal Courts, opinions have been expressed to the effect that in the absence of a direct grant of power, martial law is justified and therefore limited by necessity, and that while the executive or legislative branch of the government may by force pass upon the question of necessity in the first instance, their judgment is subject to review by the courts afterwards. See, *Ex parte Milligan*, 4 Wall, 2; *In re Kemp*, 16 Wis. 382; *Griffin v. Wilcox*, 21 Ind. 370; *Johnson v. Jones*, 44 Ill. 142. But,

although this view may be correct on general principles, and even valuable as a cautionary or preventive influence, it has, in fact, been of little value in practical application to specific cases. For, in the cases in which such opinions have been expressed, martial law had not been proclaimed, and the acts in question were attempted to be justified solely on the ground that martial law existed in fact though not proclaimed. In such cases, the courts might well inquire into or take judicial notice of the facts, for there is nothing else to go by, and in those cases they were of the opinion that there was no basis for the claim made. But where there was ground for a reasonable difference of opinion, or rather where the executive or legislative branch of the government has declared or authorized the declaration of martial law, the courts have invariably, so far as we are aware, refused to interfere, whether on the ground that these were questions of a political nature and therefore outside of their jurisdiction, or questions upon which the courts thought the other branches of government more competent under the circumstances to form a correct judgment, or not.

Thus, when, in 1842, the legislature of the State of Rhode Island declared martial law, both the State and Federal Courts declined to review the decision of the legislature, the Supreme Court of the United States holding, in *Luther v. Borden*, 7 How. 13, that: "If the government of Rhode Island deemed the armed opposition so formidable, and so ramified throughout the State as to require the use of its military force and the declaration of martial law, we see no ground upon which this Court can question its authority;" and this, although there had been no actual fighting, and the hostile demonstration, such as it was, had ceased prior to the commission of the acts complained of, and the ordinary courts were in the unobstructed exercise of their jurisdiction. The Court declined to "inquire to what extent, or under what circumstances that power may be exercised," but were of the opinion that when, as in that case (and *a fortiori* in the clearer case now in question here), the power is exercised *bona fide*, not with a view to permanency or as an

attempt at usurpation of despotic power, but when "it is intended merely for the crisis, and to meet the peril in which the existing government is placed by armed resistance to its authority, * * * the State itself must determine what degree of force the crisis demands."

Similarly, in the numerous cases arising out of the Civil War and under the Indemnity and Reconstruction Acts which followed that war, the Supreme Court took the same position, so much so that Mr. Hare, in his admirable work on American Constitutional Law (pp. 978 *et seq.*), came to the conclusion, against his own personal strong convictions of what ought to be, that it was settled by the decisions of the Supreme Court of the United States that: "Congress may, on the occurrence of insurrection or invasion, not only suspend the *habeas corpus*, but establish martial law throughout the length and breadth of the United States, and render every person in that vast territory liable to be sentenced to death by a military commission," even when "constituted for the trial and conviction of civilians who are not subject to the military law proper," and that "the power is not restricted to districts which are occupied by a hostile army, or are the theatre of warlike operations, and may be exercised over persons who are not shown or alleged to have been in arms against the United States, or to have given aid or comfort to their enemies; and it may, moreover, be relied on as a defense without proof that the act complained of was necessary as a means of upholding the authority of the government." Mr. Hare may possibly have gone too far in his deductions, but certainly he would have been justified in going to the extent of saying that when the executive or legislative department acts in matters of this nature, without express authority, their conclusions are to be taken as *prima facie* correct, subject to be set aside, so far as possible, only in cases of clear mistake or abuse of power, much as in the case of a verdict of a jury. But it will serve no useful purpose to theorize upon what may be done by the courts in case of a willful abuse or usurpation of power. In modern experience

among civilized nations, such cases are likely to be of rare occurrence, and it will be time to consider them when they arise. But this much may be, as it often has been said, that if the courts attempt to extend their jurisdiction to the conduct of war, or the settlement of all the questions arising out of war, their methods of procedure will become so impaired as to be unsuitable for the more permanent state of peace.

Secondly, what is the scope of martial law, and, more particularly, did it authorize the trial in question?

Military law, in its more general sense, is the law administered by military authority. It is of two kinds: (1) military law proper, which governs the military only, and that in both war and peace, and is chiefly of statutory origin; and (2) martial law, which is the law of war and governs all persons, both civil and military, but in war only, and is determined chiefly by usage. Martial law may be subdivided into two classes: (1) military government, which applies to cases of territorial war, whether the hostile territory is foreign or within the dominant state, as in the Civil War; and (2) martial law proper, which applies to cases of insurrection or rebellion, in districts which are in contemplation of law friendly, as the Rhode Island insurrection, and that now in question here.    Military government and martial law do not differ in principle, though they differ to some extent in applicability, because of different facts.    In this case we shall not consider those branches of martial law which apply to military government alone.    Distinguishing, then, martial law from military law proper, and, we may add, also from the mere suspension of the privilege of the writ of *habeas corpus*, which is but one of the incidents of martial law, what is its scope?

It is the law which governs in a state of war, as the civil law is the law which governs in a state of peace.    In war, the military is paramount but may be assisted by the civil authority, as in peace the civil authority is paramount but may be assisted by the military.    In a state of war, civil rights and remedies are extinguished or suspended so far as necessary or proper to

accomplish the purpose of military rule, which is the restoration
of the normal state of peace. What may be necessary or
proper in any particular case is determined largely by usage or
the common law of war. This varies with the state of civiliza-
tion. What might have been necessary or proper in the days
of Napoleon or the Duke of Wellington may not be necessary
or proper now. There is no fixed code of martial law. An
infinite variety of conditions that cannot be foreseen or pro-
vided for must be met without delay in a corresponding infinite
variety of ways. The predominant power, the military, is
the judge of what is necessary or appropriate in any particular
exigency, the judgment being conclusive, and subject to review
by the civil courts only in case of abuse of power, in which
case the military may be said to be acting outside of its juris-
diction. For, if the military commander, taking advantage
of his position, departs from his task of restoring peace and aims
at personal ends, he no longer acts under martial law. What
is required of him is that he should set his face toward peace,
and employ no means forbidden by the customs of war.

Some jurists, among whom may be mentioned Mr. Hare, in
his work above referred to, and the majority of the court in
*Ex parte Milligan, supra,* maintain that, as necessity alone
justifies, so it limits, the extent of the exercise of martial law,
and that, therefore, courts and juries may review the decisions
of the military commanders, just as they may review the de-
cisions of private individuals who use force in self-defense, or
destroy buildings for the purpose of preventing the spread of
fire, on the plea of necessity. This, however, is on the theory
that martial law, as such, is not recognized by the Constitution,
and such views have been expressed for the most part in refer-
ence to acts which were not done under martial law and which
were sought to be excused solely on the ground of necessity.
We know of no writer of note who has maintained that where
martial law was in force, especially if expressly authorized,
the courts may review the decisions of those who act under it
except in case of abuse of authority. Mr. Hare himself con-

cedes this (See pp. 958, 970) and even goes to the extent to which Mr. Justice Woodbury went in his dissenting opinion in *Luther v. Borden, supra,* in holding that those acting under the sanction of positive enactment, are not responsible in the courts even for an abuse of authority. We are not prepared to go so far, but prefer to take the view of the English courts as expressed in *Phillips v. Eyre, supra,* and in *Wright v. Fitzgerald,* referred to in 1 Stephen, His. Cr. L. 215, that acts done under martial law are not reviewable in the courts, but that neither a prior authorization of martial law nor a subsequent ratification by an act of indemnity of the usual form justifies acts of cruelty or inhumanity. Substantially the same view was taken by the Supreme Court of the United States in *Luther v. Borden, supra,* and *Mitchel v. Clark,* 110 U. S. 633, even where there was no express constitutional authority for the proclamation of martial law.

In such cases, the presumption is that what was done was rightly done and the burden of proof is on the one questioning its validity to make out a clear case of abuse of authority. The reason is this. In peace the civil government is paramount. In war, the military is paramount, and having acquired jurisdiction for the purpose of restoring peace, it must necessarily be judge of the means necessary to accomplish that purpose. If acts done under martial law are to be justified in the courts only on the ground of necessity in each case, then the military must always be subordinate to the civil authorities in war as well as in peace, which no one will maintain to be true. And for this reason the civil courts, as shown above, have recognized wide discretionary powers in the military in time of war, and have not strictly limited them either in the time or the place, or the nature of the exercise of military power. It is not unlike the case of a court of equity, which, having once acquired jurisdiction, retains it for the disposition of the whole matter, even to the extent of deciding questions which taken alone would be cognizable only in a court of law, or the case of a jury, as above stated, the presumption being in favor of the

verdict, and the burden being on the one attacking it to show, not that the jury exercised its judgment erroneously, but that it did not exercise its judgment at all.

The application of the foregoing principles to the facts of this case show conclusively that the prisoner is in lawful custody.

It may be well, however, to touch more directly upon the points raised by his learned counsel and in doing so to refer to specific cases to show that the trial in question was not in violation of the laws of war.

First, that a military commission cannot try a civilian for an offense other than an offense against the laws of war, and that misprision of treason is not such an offense.    Of the truth of the proposition that trials of civilians for offenses of any kind are authorized by the laws of war, there can be no doubt.    Such trials were had in the case of the conspirators against the life of Abraham Lincoln, and in Ireland in 1865-66, as appears by Mr. Hartwell's brief in this case, and in other instances, in which the accused were connected with the acts which called forth the exercise of martial law.    These were not all trials for what petitioner's counsel refers to as offenses against the laws of war, such as the killing of non-combatants, engaging in guerilla warfare, using poison, acting as spy, or violating a truce.    Some of them were merely trials of the enemy or traitors not entitled to rights as belligerents, and even the conservative Mr. Hare says that, without any express constitutional authority, suspected individuals may, in order to prevent insurrection, be arrested and tried by court-martial, if the emergency does not admit of delay.    But the power to try by military commission is not confined to cases connected with the war or insurrection.    The Court in the Milligan case based their decision on the ground that the petitioner was not a prisoner of war (erroneously perhaps, see 1 Bish., Cr. L. Sec. 64 n. 1.), and therefore came within the Act of Congress providing for his discharge, and were further of the opinion, *obiter*, that he could not be tried by military commission when martial law was not in force, assuming that if martial law were in force he might

have been so tried.    The Supreme Court of the United States has repeatedly held that in time of war, if necessary, the President may establish provisional courts for the trial of all cases, civil as well as criminal.    *Mechanics' &c. Bank v. Union Bank,* 22 Wall. 276; *The Grapeshot,* 9 Wall. 120; *Leitensdorfer v. Webb,* 20 How. 176; *Cross v. Harrison,* 16 How. 164.    Under the Reconstruction Acts the military commanders were authorized to try by military commission any criminal offense whatever, as they thought necessary, and they were sole judges of the necessity, 12 Ops. Atty. Gen'l., 183, 199.    No doubt the President should leave as much as, in his opinion, could be safely left to the civil courts, and we have every reason to believe that he did so during the insurrection of January last. He took from their jurisdiction only such cases as arose out of the insurrection and these, no doubt, because in his judgment, it was, under the circumstances, necessary and proper to do so. It is unnecessary for us to discuss the moral quality of misprision of treason or the wisdom of making it a criminal offense.    It is recognized as an offense in England and in the United States, our statute being almost identical with that of the United States. R. S. of U. S., Sec. 5333.    Very few persons were brought before the Commission on this charge, and, no doubt, only those were arraigned who were guilty of close complicity with the insurgents.    It is not difficult to imagine a case of misprision of treason in which the offender would be as dangerous and morally as guilty and deserving of punishment as in some cases of actual treason, as, for instance, if a prominent person should mingle freely with the insurgents when assembled preparatory to insurrection and should thereby, though not actively encouraging, yet exert his silent influence upon those subject to it, and should, with full knowledge of all the plans and equipment of the enemy, refuse to divulge the same for the preservation of the Republic.    If the Military Commission did not have jurisdiction of this case, it must have been for some other reason than that it could not try a civilian for an offense other than an offense against the laws of war.

Secondly, that a military commission cannot try any case whatever after actual hostilities have ceased, or while the ordinary courts are in session. Some authorities at first glance seem to hold this view, but a careful examination of them will disclose that what was really held was that military commissions cannot try cases in a state of peace. The question was not whether actual hostilities had ceased and the courts were in session, but whether there was a state of peace and the courts were unobstructed in the full exercise of their jurisdiction.

A state of war does not cease with actual hostilities. "Military government may 'legally be continued *bello nondum cessante*, as well as *flagrante bello*.' * * * It is easier to provoke a civil war than to restore the confidence without which peace returns but in name. Under these circumstances the reasons which justify martial law subsist." Hare, Am. Const. Law, 938. "As domestic war is not prosecuted with a view to conquest, but to restore the normal condition which the rebellion interrupts, the right to employ force may be thought to cease with the termination of hostilities. It must still, however, be in the discretion of the government to determine when the war is at an end, and whether the insurgents are sincere in laying down their arms, or intend to renew the contest at the first favorable opportunity; and while this uncertainty continues, military government and occupation may be prolonged on the ground of necessity." *Ib.* 949. In the case of an insurrection the military power "is not limited to victories in the field and the dispersion of the insurgent forces. It carries with it inherently the power to guard against the immediate renewal of the conflict, and to remedy the evils which have arisen from its rise and progress." *Stewart v. Kahn*, 11 Wall. 493. Accordingly, in Rhode Island, martial law was enforced although the courts were in the ordinary exercise of their jurisdiction, and after actual hostilities had ceased. So in Louisiana long after the cessation of hostilities and the restoration of the courts, following the civil war. *Burke v. Miltenburger*, 19 Wall. 519. And later still, under the Reconstruction Acts.

"The obstacle to the due course of justice" may be, "not of a physical," but "of a more formidable" nature—the "secret machinations" and complicity of friends of the insurgents. To indict and try traitors before jurors who strongly sympathize with them would be a useless farce. See *Birkhimer, supra,* 374. And it was for this reason largely that trials of offenses of every kind by military commissions were authorized under the Reconstruction Acts for several years after the termination of the Civil War; and, in Missouri, in 1861, when the ordinary courts were apparently in the unobstructed exercise of their jurisdiction, yet there being only a "calm exterior, while close underneath rebellion was fermenting, * * * those arrested on suspicion of guilt were tried by military commissions." *Ib.*

A striking proof of the futility of trials in the regular courts in cases arising under the circumstances of the present case is afforded in the recent history of our own country. In 1889, on the occasion of an insurrection under the Monarchy, of much less magnitude than that of last January under the Republic, and accompanied by much less excitement and hostile feeling, it was impossible to secure convictions of Hawaiians by Hawaiian juries, even on conclusive evidence of guilt. To a large extent the same persons were engaged in both of these insurrections.

Without further enlarging upon the question of the necessity for these trials by military commissions, it will be sufficient to say that martial law was properly in force at the time, and that of itself was, in contemplation of law, an impediment to the jurisdiction of the courts. Cooley, Const. Law, 138. For, as has been many times held, an authorized proclamation of martial law is notice and conclusive evidence to the courts that a state of war exists.

Thirdly, that a military commission cannot try an offense completed before an actual outbreak and the consequent proclamation of martial law, and that misprision of treason, if committed, must have been completed before such time. We need not consider the first part of this proposition, for we see no

reason why misprision of treason may not have been committed after as well as before the outbreak. Without considering the question whether the fact, that that of which the knowledge was concealed was already known to the proper authorities, made the concealment innocent, through no doings of him who would otherwise have been guilty, we certainly are not in a position to hold that in this instance valuable information relating to the insurrection was not withheld long after the outbreak and before the authorities ascertained it from other sources. For, full knowledge of the numbers, location, equipment, plans and *personnel* of the insurgents was quite as important to the Government as knowledge of the mere fact that an outbreak was to take place, and if the authorities had been in possession of these facts, so far as known to the petitioner, at as early a time as possible after the outbreak, how different might have been the result ! The knowledge concealed was of more than the mere fact that an uprising was contemplated.

Fourthly, that the offense of misprision of treason was taken out of the jurisdiction of the military commission by the saving clause in the proclamation which reserved to the regular courts power to conduct ordinary business. Counsel on this point, cites *Union Bank v. Planters' Bank*, 14 Wall. 483, in which the Court held that a reservation in General Butler's proclamation, that "all rights of property of whatever kind should be held inviolate," amounted to a pledge which should be respected. But the Court went on to say that this did not exempt enemies' property from confiscation. It protected only private property from seizure as booty.

It seems to us that even if "ordinary business" may be considered as covering cases which arose out of the extraordinary matters which occasioned the issuance of the proclamation, it was certainly in the power of the President under the authority of martial law, if he deemed it necessary in the light of subsequent events, to alter the reservation by the appointment of a commission to try the cases which arose out of the insurrection.

There was no contract with the enemy that he should be tried in the ordinary courts.

Fifthly, that the President could not delegate to the Judge Advocate the power to bring prisoners before the military commission. It would be impossible for the President to do everything and be everywhere in person. He must necessarily have the power to delegate military authority. And even in the absence of an express delegation of power, the subordinate would be presumed to have acted under the orders of his commander-in-chief, and his acts would be regarded as those of his superior. *Mechanics' &c. Bank v. Union Bank*, 22 Wall 297. In this case, the President, as appears by the petition, expressly approved of all that was done.

No sufficient ground having been shown for the discharge of the petitioner, he is remanded to the custody of the respondent.

*Paul Neumann*, for the petitioner.

*A. S. Hartwell* and *L. A. Thurston*, for the respondent.