**Ex parte DUNCAN.**

**Habeas Corpus No. 298.**

District Court, Hawaii.
April 13, 1944.

977

J. Garner Anthony (of Robertson, Castle & Anthony), of Honolulu, T. H., for petitioner.

G. D. Crozier, U. S. Dist. Atty., and Edward A. Towse, Asst. U. S. Dist. Atty., both of Honolulu, T. H., Edward J. Ennis, Sp. Asst. to Atty. Gen. of the United States, and Lieut. Col. William J. Hughes, Jr., Judge Advocate General's Department, both of Washington, D. C., and Lieut. Col. Eugene V. Slattery, Office of the Military Governor, of Honolulu, T. H., for respondent, Duke Paoa Kahanamoku, Sheriff.

METZGER, District Judge.

Before argument of counsel on the issues in this case was begun the court made the following announcement and rule:

The questions in this case are not whether Lloyd C. Duncan created a disturbance on a naval reservation where he was employed, or whether he committed an assault on marine guards or was assaulted by marine guards, or whether he had a fair trial before an army provost court, in accordance with late day practice before such courts, or whether he was unjustly found guilty and given an inordinately severe sentence upon the offense charged, or whether he was mistreated by the sheriff in being forced to perform hard labor when the mittimus under which the sheriff took him in custody did not impose hard labor, nor whether the sheriff has any lawful right or power to assign hard labor upon a prisoner taken by him into the city and county jail, even had the mittimus demanded it.

These questions were of passing interest during the trial and much testimony was offered as to some of them, but all of them are considered immaterial and irrelevant to the predominant and controlling question presented in the case, and all evidence relating to them will be disregarded. It is now ordered stricken.

The question here is: Has a Provost Court, set up in the Navy Yard at Pearl Harbor, Oahu, under an order of October 27, 1943, of "the Military Governor of the Territory of Hawaii," lawful power to try and convict a civilian residing outside of any naval or military reservation, of violation of an order of the Military Governor of March 10, 1943, committed on a naval reservation with respect to naval personnel?

The Provost Court in question was set up by the appointment by General Orders No. 39 of October 27, 1943, emanating from the Office of the Military Governor at Honolulu designating Lt. Comdr. Arthur L. Mundo, United States Navy, as a Provost Court at U. S. Navy Yard, Pearl Harbor, Oahu, T. H., and assigning him to duty "for the trial of such persons as may properly be brought before the court."

The main question is involved in and brings forward several other questions, one of underlying and vital importance being:

Did the office of Military Governor of the Territory of Hawaii lawfully exist at the time it appointed Lt. Comdr. Mundo as a Provost Court at Pearl Harbor Navy Yard?

This question is directly at issue and to my mind a determination of it disposes of the entire case.

In considering this question we must go back to the day when Japan's forces attacked Pearl Harbor, December 7, 1941, upon which day Governor Poindexter issued a proclamation declaring that the Hawaiian Islands were attacked and invaded by the armed forces of the Empire of Japan, and that public safety required the suspension of the privilege of the writ of habeas corpus until further notice, also placing the Territory under martial law, and further, requesting the Commanding General of the Hawaiian Department to exercise all the powers normally exercised by him, as governor, during the existing emergency and until the danger of invasion was removed. The Governor in his proclamation then went further and said he authorized and requested the Commanding General and his subordinate personnel to whom he might delegate such authority, during the emergency and until the danger of invasion was removed, to exercise the powers normally exercised by judicial officers, and employees of the Territory and the counties and cities therein, and such other and further powers as the emergency may require. The Governor presumed, and stated, that he acted under authority of the provisions of Section 67 of the Organic Act, which says:

"Sec. 67. Enforcement of law. That the Governor shall be responsible for the faithful execution of the laws of the United States and of the Territory of Hawaii within the said Territory, and whenever it becomes necessary he may call upon the commanders of the military and naval forces of the United States in the Territory of Hawaii, or summon the posse comitatus, or call out the militia of the Territory to prevent or suppress lawless violence, invasion, insurrection, or rebellion in said Territory, and he may, in case of rebellion or invasion, or imminent danger thereof, when the public safety requires it, suspend the privilege of the writ of habeas corpus, or place the Territory, or any part thereof, under martial law until communication can be had with the President and his decision thereon made known." 48 U.S.C.A. § 532.

Under color of the Governor's relinquishment and transfer of the powers and duties placed upon and required of him by this and other sections of the Organic Act, the Army took over and established what it called the Office of Military Governor. The Commanding General (Lt. General, Walter C. Short) issued a proclamation of his own in which he said:

"I announce to the people of Hawaii, that, in compliance with the above request of the Governor of Hawaii, I have this day assumed the position of Military Governor of Hawaii, and have taken charge of the government of the Territory, of the preservation of order therein, and of putting these islands in a proper state of defense."

"The imminence of attacks by the enemy and the possibility of invasion make necessary a stricter control of your actions than would be necessary or proper at other times. I shall therefore shortly publish ordinances governing the conduct of the people of the Territory with respect to the showing of lights, circulation, meetings, censorship, possession of arms, ammunition, and explosives, the sale of intoxicating liquors and other subjects."

This form of military government continued without abatement until March 10, 1943, during which time more than 180 General Orders were issued from the Office of the Military Governor regulating the acts and affairs of the population of the islands and the management of their property in many particulars.

On August 17, 1942, Ingram M. Stainback was inducted into office as Governor of the Territory, succeeding Governor Poindexter who had abdicated to the Army command on December 7, 1941.

The evidence shows that at the time or shortly after his inauguration to office Governor Stainback became convinced that there existed no right or reason for the continuation of the suspension of the writ of habeas corpus or the continuation of martial law in any form; that he went to

the National Capitol for the purpose of discussing this situation with the Department of the Interior and the Department of Justice in the hope of having military government removed and civil government fully restored; that he was met there by General Emmons then Commander of the Hawaiian Division, and later found the War Department officials adamant in the contention that military government should be continued here as a military need, particularly in the control of labor. That, after more than a month of frequent, almost daily, conferences between officials of the Departments of Interior, Justice, and War, a compromise was agreed upon, which he says was to restore about ninety-five per centum of the civil government to civil administration, in accordance with laws; that he deemed it impossible to convince all of the three departments in conference of the merits of his contentions and concluded that a half loaf was better than none at all.

Accordingly upon his return here he issued, on February 8, 1943, a Proclamation, the form of which had been prepared and agreed upon by the conferees at Washington. This proclamation sets forth a Whereas, that the Governor of Hawaii on December 7, 1941, placed the Territory under martial law and the President confirmed that action on December 8, 1941, and then recites a Whereas that such state of martial law continues in effect and the privilege of the writ of habeas corpus remains suspended. The Proclamation then proclaimed, under the stated authority given by Section 67 of the Organic Act:

1. That, "The Governor of Hawaii and the other civilian officers and agencies of the federal, the Territorial and the local governments, will resume on the thirtieth day hereafter their respective jurisdictions, functions and powers, according to law, with respect to the following matters, and others necessarily related thereto:"

2. Thereafter are enumerated and listed eighteen general and specific classes of activities, including "Judicial proceedings, both criminal and civil," which are to be performed, according to law.

■ Now, one feature of this proclamation has been construed by this Court, that

relating to the suspension of the writ of habeas corpus and that question is in a category somewhat akin to res judicata, more scientifically described as stare decisis.

There remains the question: Was martial law likewise revoked and brought to an end by the Governor's said proclamation, or, had it already ceased to lawfully exist by reason of the change in conditions respecting imminent danger of invasion?

The Governor testifies that he was emphatically of opinion that it should be revoked absolutely as, in his judgment, based upon surrounding and prevailing facts and conditions there existed no necessity that could support it, but that it was the agreed intention of the Washington conferees, in which he joined for policy reasons, that military government should be abolished only in part and that a part of it, which General Richardson calls a modified form of martial law, should remain in force and effect.

General Richardson comes into court and testifies at considerable length that in his opinion the continuation of martial law is absolutely necessary, in its present form as a modified military government in his hands, for the safety of the population here and in the proper prosecution of war efforts. He argues in his testimony that he should have control over the civilian population in this area as well as the armed forces and have full authority to establish and control courts for enforcing his orders relating to certain civilian acts and conduct. In support of the legality of martial law he states his opinion to be that Hawaii is and has been continuously since December 7, 1941, in imminent and constant danger of attack by Japanese agencies of warfare.

Admiral Nimitz agrees with General Richardson as to the possibility of some form of warfare attacks and as to the desirability and expedience of retaining the present military government.

Both gentlemen, however, agree that an invasion by enemy troops is now practically impossible.

■ With due respect to the opinions of General Richardson and Admiral Nimitz

that martial law is desirable and necessary in a field of war operations that distributes supplies, trains soldiers, marines and sailors, and is a seat of administration of war activities, I find myself bound not by their opinions, but by the laws of the land, in arriving at legal conclusions.

■ The United States of America, of which Hawaii is an integral part, are governed by constitutionally established laws, to which their people are entitled, as well as being subjected—primarily, the national Constitution, and secondarily, the laws enacted by the Congress. It is a matter of general knowledge that the people, with few exceptions, wish to protect and perpetuate that system, and such purpose is an issue in the present war. Some countries in Europe have tried a dictator system where the dictator could peremptorily pronounce laws and the rights of the subject to life and liberty, as he and his self-appointed courts and executives might decide from time to time. Many views have been advanced that such is the correct and efficient system for successfully conducting war, but that system is now on its way out. It is the antithesis of Americanism and nothing short of riotous conditions and dissolution of lawfully constituted government can justify it in civilian affairs of the land.

■ Civil affairs and civil government extend, in operation of law, to the battle zone or military camps, even in time of war and, for many purposes, inside military reservations, particularly where civilians are concerned. Camp followers and civilians attached to military war activities do, as to certain of their acts, come absolutely under military control and are subject to military law and court martial for certain offenses and disobediences when serving in the field of battle. No part of the Island of Oahu in the Territory of Hawaii is in a battle field today, nor has it been for over two years, nor was the petitioner serving the Army in the field. These facts were fully shown by evidence. The Navy has recently been given similar authority by Congress, but not in Hawaii, except as to Midway, Palmyra, and Johnston islands.

We have now been at war with Japan for over two years and four months—and I recognize it to be a well known fact that during this time the entire nation, particularly the Congress of the nation, has been enthusiastically warminded to a degree that any protective measures desired by the Army or Navy could be had for the asking, upon a reasonable and convincing showing of such needs. Much legislation of such kind has been enacted. If the present laws do not give the Nation the fullest desirable protection against subversive or suspicious Japanese aliens, or even native-born persons of alien parentage, and such fact is known to the Army or Navy organizations, clearly it is the duty of such organizations to ask for legislative curb and procedure, instead of insisting upon holding by force of arms an entire population under a form of helpless and unappealable subjugation called martial law or military government, under the reasoning of Army or Navy officers that such form of government is required, or is convenient to them, in local and national protection and safety.

■ There can be no question that martial law depends for its creation and existence upon a condition of disorder so great as to disrupt the orderly performance of civil government. It cannot be justified under the Constitutional provisions for the operation of our government upon any claim of military convenience or economic practicality.

■ Congress may give the Territory of Hawaii any form of government it may see fit, conformable to Constitutional provisions, but no one in the War Department has such lawful power.

■■ We entertain the highest respect for the gentlemen who gathered with Governor Stainback at Washington and discussed the problems confronting the war administration here in late 1942. No one could question their earnest sincerity in efforts to provide for the best protection of national war interests. That, however, is outside of the problem brought before the court. The court must look into their lawful authority to devise and lay down a government for the people of Hawaii. No one among them had authority, under the known conditions that prevailed at that time, to declare martial law or order that it

be continued. The Governor was the only one in whom the power was vested under the Organic Act to declare it under any circumstances. At that time he could not make the finding of fact that was necessary for its lawful declaration. Upon the contrary, he knew that all grounds of necessity in public safety had passed. He had no more authority to declare it in part than in whole.

If he and the other gentlemen acted upon the assumption that the executive and judicial government of Hawaii had lawfully passed to the hands of the Commanding General of the Hawaiian Department by reason of Governor Poindexter's proclamation, and was then vested there, they were in error, for the Organic Act, under which the Governor avowedly acted, gave him no such power of transfer or abdication, but fixed upon him alone the responsibility for the faithful execution of the laws of the United States and of the Territory within the Territory.

The right to establish martial law under Sec. 67 of the Organic Act springs from the necessity arising from disorders such as disrupt and make inoperative civil government and it ceases and becomes unlawful as soon as the civil government is capable and willing to resume its normal functions.

It is argued by the Assistant United States Attorney General, appearing in the case for the Respondent, the custodian of the City and County of Honolulu jail, that when martial law was once declared by the Governor and his action was approved by the President it must continue until the President revokes the order and restores the rights of civil government. I do not so construe the meaning or purpose of the last sentence of Sec. 67 of the Organic Act. Proclaiming martial law and suspending of the privilege of the writ of habeas corpus being drastic and extraordinary measures, it is but reasonable to suppose that Congress in entrusting such powers with the Governor of Hawaii considered that it should provide some supervisory check, and gave power to veto to the President. I can see nothing to justify a supposition that in giving the Governor authority to evoke such rules, if in his judgment a condition of high disorder existed or threatened, Congress intended that once he had so acted Presidential approval should be required to undo his act which had displaced the government which Congress had carefully provided. Tidal floods, earthquakes, or riots might make it seem necessary to call out the militia and declare martial law in given districts for a short time, and it does not make sense to suppose that Congress intended in the year 1900, when the speediest known means of communication with Washington might require as much as three weeks time in either direction, that martial law once evoked here must continue until undone by the President, notwithstanding that the Governor might discover he had erred in judgment in having evoked it, or that its legitimate purpose had been fully served.

I find from the evidence that at all times during the year 1943 and continuing to this day, conditions were such throughout all the principal islands of the Territory of Hawaii that the regularly constituted civil government was either in efficient operation or fully capable of such operation in all its branches and ordinary departments and was sufficiently equipped, capable and willing to perform all functions for which it was created.

I find from the evidence that while the Island of Oahu may have been on March 2, 1944, and thereafter to this day, subject to possible attack by enemies at war, that it was not then, nor is it now, in imminent danger of invasion by hostile forces, neither was or is it in rebellion.

I conclude as a matter of law:

1. That martial law did not lawfully exist in the Territory of Hawaii during the year 1943, particularly after March 10, 1943.

2. That the office of Military Governor of the Territory of Hawaii is without lawful creation and, as such office, possesses no lawful authority over civilian affairs or persons.

3. That the office of Provost Court at Pearl Harbor Navy Yard, Oahu, T. H.,

created by General Orders of The Military Governor, possessed no authority in law to try, find guilty, and sentence the civilian petitioner to imprisonment in the county jail of the City and County of Honolulu.

Wherefore, the writ is sustained and the petitioner ordered discharged from custody. It is also ordered that his appearance bond be and it hereby is cancelled and the cash bail deposited by him with the clerk be refunded.