**Ex parte SPURLOCK.**

**Habeas Corpus No. 301.**

**District Court, Hawaii.**
**June 23, 1944.**

Brahan Houston (appointed by the Court), of Honolulu, T. H., for petitioner.

G. D. Crozier, U. S. Dist. Atty., and Edward A. Towse, Asst. U. S. Dist. Atty., Lieut. Col. Eugene V. Slattery, Office of the Military Governor, and Capt. Angus M. Taylor, Jr., U. S. Army, Office of the Military Governor, all of Honolulu, T. H., for respondent.

McLAUGHLIN, Judge.

This habeas corpus proceeding differs from the Duncan and White cases (Ex parte Duncan, D.C., 66 F.Supp. 976; and Ex parte White, D.C., 66 F.Supp. 982) essentially in that:

(a) It involves a period of time prior to the Battle of Midway.

(b) Here the fictitious role of "Military Governor of Hawaii" is abandoned, and forsaken is the theory that the General had the judicial powers of the courts of the Territory because the Governor of Hawaii delegated them to him on December 7, 1941.

In lieu thereof, it is advanced that martial law having been declared, the General had the total powers of government in Hawaii—executive, legislative, and judicial—and hence deeming it necessary from a military point of view, he had authority to try civilians for infractions of Territorial law in military courts.

I.

Historical Facts.

As these facts are the same as those recited under this heading in the White case

and are the subject of judicial notice, it is not necessary to repeat them here.[1] It is necessary only to note that by appropriate General Orders the General had designated Lt. Col. Neal D. Franklin, J.A.G.D., and Lt. Col. John R. Hermann, Infantry, as judges of the Honolulu Provost Court during the time here involved. At this time also General Emmons was the Commanding General and so-called "Military Governor of Hawaii."

II.

Facts of Spurlock Case.

The petitioner, Fred Spurlock, was born in Alabama. After being graduated from high school he went to sea as a cook. Prior to and after the war he was employed in Hawaii as a civilian defense worker He neither has been nor is in any way connected with the armed services.

(a) In November 1941 Spurlock was ejected from a bar for disorderly conduct. He verbally protested the "bouncer's" action, and while so engaged in conversation, the "bouncer," seeing a civilian policeman coming down the street, called Spurlock's attention to the approach of the patrolman and gave him to understand that if he did not move on the policeman would be called. Spurlock took off on the run and collided with two military policemen who held him and turned him over to the civilian police officer. By the latter he was arrested and charged with assaulting a police officer. He was released upon bond, and later appeared in the District Court of Honolulu to answer to that charge. There he was told by the presiding magistrate that his case was continued and to return when so advised by his bondsman.

Spurlock heard nothing more about his case until after the outbreak of the war. On January 14, 1942, he received a document from the Provost Court of Honolulu directing him to appear in that court January 15, 1942, to answer to the charge of November 1941. On January 15, 1942, he plead "not guilty" but the Provost Court of Honolulu found him guilty as charged under Territorial law and sentenced him to five years imprisonment. Spurlock begged

---

[1] For another convenient source, see Martial Law in Hawaii by Garner Anthony, Vol. 30, California Law Review, pp. 371-396; and Martial Law Military Government and the Writ of Habeas Corpus in Hawaii by Garner Anthony, Vol. 31, California Law Review, pp. 478-514.

the presiding army officer for probation and succeeded; the prison sentence was suspended and he was placed upon probation. Neither the term nor the conditions of probation were specified. He was simply placed on probation and told to report to the Territorial probation officer, which he did.

(b) On March 24, 1942, Spurlock was involved in a fight with another civilian, which is described as a "cutting affair." This event did not occur upon a military reservation. Spurlock was arrested by the Honolulu police and charged with violating Section 5656, Revised Laws of Hawaii 1935, as amended (assault with a weapon obviously and imminently dangerous to life). He was placed in custody, told that the Provost Court did not release defendants on bond, and four days later, on March 28, 1942, was taken to the Honolulu Provost Court, which at that time occupied the Honolulu District Court premises. The Provost Court had called his case March 25, 1942, and continued it to March 28, though he did not appear on the twenty-fifth.

At this point the evidence is conflicting. There were available only two people who had any reason to recall what happened in the Spurlock case in the Provost Court on March 28, 1942. One was Spurlock himself and the other a Miss Woodside, who was a clerk-stenographer-reporter of that court.

Spurlock testified that when his case was called, Colonel Hermann, presiding as judge, said to him, "Oh, I see you are back! You are on probation, aren't you?" To this Spurlock says he replied, "Yes, sir." Next the charge was read by a civilian policeman. An officer then addressed the court saying that the Territorial probation officer had nothing to do with Spurlock's probation as he had been put on probation by the Provost Court, whereupon the Colonel promptly said, "Five years at hard labor— that is all." Spurlock said he asked to be sent into combat, but the judge replied that there was nothing more to be said, adding "Take him away." In answer to whether he asked for an attorney, Spurlock said, "No," for his January experience revealed

to him that attorneys were useless in provost court, and as to witnesses he said he did not have time to ask for such as he was enroute to prison inside of five or ten minutes from the time he was taken into the crowded courtroom. Spurlock was repeatedly questioned by respondent if he had not been asked if he was guilty and if he had not said, "Yes." To both questions Spurlock repeatedly said "No." Intense cross-examination did not shake him. He appeared to know what he was talking about and to be telling the truth.

The opposing evidence does not show how many cases were handled by the Provost Court on March 28, 1942, but the calendar for that day identified by Mrs. Wist, principal clerk, Honolulu Provost Court, so that the page relating to the Spurlock case could be used later, indicated that it was a very sizable calendar. The chief clerk, Mrs. Finkboner, testified that she was not in court that day, but the usual procedure was for notes to be made on the official calendar as to the disposition of the cases; that thereafter a clerk-stenographer took that calendar with the notes on it and typed up a form for Colonel Hermann to sign. A form applying to the Spurlock matter was marked Respondent's Exhibit No. 1 for Identification. With reference to it Mrs. Finkboner said she knew and recognized Colonel Hermann's signature, and hence the document meant to her that Spurlock plead and was found guilty. The objection to the reception into evidence of this document was sustained on the grounds that as it did not come from a court of record, it did not prove itself, and further that recognition of a signature was not proof of content. This document was no more admissible into evidence to prove that Spurlock plead and was found guilty than a letter to that effect from Colonel Hermann would have been. In effect this court was requested to consider that Colonel Hermann said Spurlock plead and was found guilty simply because Mrs. Finkboner knew the Colonel's signature and from it she inferred certain things.

Such being the ruling of the court, respondent presented Miss Woodside who stated that she was on March 28, 1942, clerk-stenographer-reporter of the Provost

Court of Honolulu; that she distinctly recalled Spurlock because she remembered how quiet he had been; and that he plead guilty to the charge. Inquiry as to how she knew Spurlock plead guilty revealed that it was her custom to put a "g" on the calendar if a defendant plead guilty and "n.g." enclosed in a circle if the plea was not guilty. Respondent's Exhibit No. 20, a page of the March 28 Provost Court calendar admitted for illustrative purposes, shows she put a "g" against the Spurlock case, therefore she was able to state that the Provost Court inquired as to the defendant's plea and that Spurlock plead guilty. Whether the same "g" also means to her that Spurlock was adjudged guilty does not appear. It is interesting to note that this same exhibit shows the provost judge to have been Colonel Franklin though it was in fact Colonel Hermann. Whether Colonel Hermann treated Spurlock as a probation violator or treated him as guilty on the new charge, the "g" sufficed for Miss Woodside's purposes—to her it was not a case which had to be tried. At best her "g" meant "case disposed of."

Upon the ultimate issue of jurisdiction of the Provost Court over the offense and over the person of Spurlock the conflict in the evidence on this question of fact is unimportant. It has been recited because both parties attached considerable importance to it. Respondent seems to think that if Spurlock plead guilty, he thus waived all of his constitutional rights and cannot be heard to complain. Petitioner, through counsel appointed for him, claims the March 28 occurrence was a revocation of probation in relation to an offense handled January 15, 1942, by the Provost Court despite its occurrence prior to the war. Over and beyond the questions seen in the conflict by the parties, the court saw, and called counsel's attention to, the question of whether, assuming all else, Spurlock was given a fair military hearing.

Upon the issue of whether Spurlock plead guilty on March 28, respondent had the burden of proof. I am not satisfied that respondent has discharged that burden. I therefore find as a fact that Spurlock did not plead guilty to the March 28 charge, but was, without trial, found guilty and dis-posed of accordingly by the Honolulu Provost Court.

Additional uncontested facts in this case are that after being sentenced, another provost judge (Colonel Franklin) committed Spurlock to the custody of the respondent and ordered the Warden of Oahu Prison (Territorial) to receive and hold Spurlock under the sentence of the Honolulu Provost Court.

While in prison Spurlock and his friends and relatives beseiged the "Military Governor" with letters and as a result of his five-year sentence was reduced to two and a half years by the "Military Governor."

### III.
### Other Pertinent Facts.

Many of the same documents put into evidence in the Duncan and White cases were by agreement received here also. For the most part they consist of General Orders issued by the General and other facts susceptible of judicial notice. Outside this category, however, were documents (Respondent's Exhibits Nos. 12 to 17, inclusive) showing that the executive branch of the Federal Government intended to continue martial law and the suspension of the privilege of the writ of habeas corpus despite the so-called partial restoration of civil rights to the Territorial government effective March 10, 1943, by reason of Governor Stainback's proclamation of February 8, 1943.

Additionally the respondent's witness:

(a) Captain Preston C. Mercer, United States Navy, an assistant chief of staff to Admiral Nimitz, testified that in his opinion, as a naval man, Hawaii was in imminent danger of invasion during the period in question—December 7, 1941—March 28, 1942. The Captain was not here during all of this time, but said he kept informed.

(b) Colonel Kendall J. Fielder, General Staff Corps, United States Army, G–2, who was here during the period in question, said the same thing, as an army man, and additionally that it was then necessary from a military standpoint to try civilians in military courts upon Territorial charges because:

(1) The civil courts were closed.

(2) In order to enforce his orders the General had to have absolute control of the courts. There were problems involving the behavior of the civil population not covered by either Federal or Territorial law. The General could not be expected to carry the burden of having to persuade the same civil officer who declared martial law —the Governor of Hawaii—of the necessity of covering the subject by a prompt exercise of his powers under the M-Day Act, Laws 1941, Sp.Sess., p. 1 (a measure passed by the Territorial legislature at a special session in 1941 at the army's specific request so that it would not have to bother with civil affairs in the event of war). Rather the General had to be in a position to issue his own orders with the knowledge aforehand that his controlled courts would enforce them precisely as he dictated.

(3) Of the diverse nature of Hawaii's population. Despite the fear of fifth-column activity the Colonel admitted that there had been no known or proven acts of sabotage by any person of Japanese extraction.

(4) Manpower being limited it was advisable to

a. Avoid manpower consuming trials in civil courts which involve juries, witnesses and delays.

b. Set examples by having the provost courts hand out severer sentences than those ordinarily given by civil courts in peace time.

(c) Mr. Gus Sproat, clerk of the Territorial Supreme Court, stated that his records showed that the courts of the Territory obeyed the General's orders relating to the Territorial courts.

(d) Major Wickhem, Judge Advocate General's Department, United States Army, Provost Court Commissioner, stated that though he was not in Hawaii nor in the army until October 1942, he had consulted the records of the Honolulu Provost Court and was thus able to say that in its earlier days the Provost Court handed out severer sentences than it now does; and that it was the practice of that court to proceed on written charges, to take pleas, to make findings, and to keep records.

The petitioner incorporated by agreement:

1. A part of Governor Stainback's testimony in the Duncan case (Habeas Corpus No. 298, Record Part 4, pp. 33, 34), apparently intending to show by it that at the time of the Washington conference in 1943 Governor Stainback did not believe that the continuation of martial law was then necessary.

2. A part of Judge Cristy's testimony in the same case (Habeas Corpus No. 298, Record Part 1, pp. 108, 109) wherein Judge Cristy of the First Circuit Court stated that the Territorial courts were closed only because of the military orders and could have operated if permitted to do so, and would have given due consideration to circumstances created by the war.

## IV.

### Contentions.

The respondent contends that:

(1) The privilege of the writ has been suspended since December 7, 1941, and to date the suspension not having been revoked this court has no jurisdiction.

(2) The court is limited to determining if martial law was lawfully invoked, and if it was, whether its continuance is necessary is not a judicial question, the power to revoke being exclusively in the one who had been given power to invoke it. Absolute martial law, it is said, does not permit of judicial inquiry.

(3) In any event, upon the facts the court must find that the General was not unreasonable in holding to the opinion that during the time involved the continuance of martial law was a military necessity.

Whether the court follows point (2) or point (3) is not particularly important if the conclusion is reached that under martial law the General had all the powers of the Territorial government, and his own war powers too, and hence could lawfully try civilians for infractions of Territorial law in military courts.

(4) The respondent need not rely only upon the declaration of martial law by the Governor of Hawaii, for what the General did he could have done anyway by invoking the same war powers himself.

The petitioner says:

Whether martial law was or was not validly in existence in March 1942 is immaterial, for even if it did validly obtain under it the General had no lawful right to try a civilian in a military court upon a charge of violating a Territorial law. For such a claimed power it is additionally said there was no military necessity.

## V.

### Conclusions of Law.

■ The Provost Court had neither jurisdiction over Spurlock's person nor over the offense with which he was charged. Its judgment of conviction was consequently null and void and the petitioner has been unlawfully deprived of his liberty and of his constitutional rights under the Fifth and Sixth Amendments.

## VI.

### Opinion.

■ Respondent contends that the privilege of the writ has been and remains suspended, and therefore this court has no jurisdiction to grant the prayer of the petition.

■ Whether the privilege of the writ was validly suspended December 7, 1941, and whether it remains lawfully suspended today (1944) are two different questions, and they are both judicial questions.

■ The answer to the first question is clearly Yes.[2]

■ The second question has been answered heretofore by prior decisions of this court.[3]

Yet the respondent continues to argue the point while appealing the Duncan and White cases. The argument is that the February 8, 1943, proclamation[4] which was issued by the Governor of Hawaii pursuant to an agreement reached in Washington, does not mean what it says, that it is am-

biguous and the court must look in back of it to the Washington negotiations.[5] Not saying what was intended to be said when otherwise the document is perfectly clear does not create an ambiguity. Originally the Governor of Hawaii had suspended the privilege of the writ "until further notice"[6] and on February 8, 1943, the Governor of Hawaii proclaimed that thirty days thereafter all courts, Federal and Territorial, should resume all of their powers with certain exceptions not here material. This court has held that the February 8, 1943, proclamation means precisely what it says and that as of March 10, 1943, the privilege of the writ was no longer suspended. This point was squarely in issue in the Glockner and Seifert cases. The court issued the writ; the General refused to obey it and was found guilty of contempt. Later he was pardoned by the head of that branch of our government which still argues that the February 8 proclamation does not mean what it says and that the privilege of the writ is still suspended. In pardoning the General the President himself recognized the correctness of Judge Metzger's holding that the privilege of the writ was not then or thereafter suspended.

As further indicative of the confusion of thought, when the Glockner and Seifert cases became moot because the army released the petitioners, a representative of the Attorney General publicly stated to the press that the privilege of the writ remained suspended only as to persons held under military authority.[7]

■■ There is of course no reason today why courts cannot upon proper petitions require the military or anyone else to justify in point of law the detention of individuals. The basis upon which Governor Poindexter suspended the privilege of the writ disappeared after the Battle of Midway or certainly by the proclamation of February 8, 1943. Surely military security is not

---

[2] Act April 30, 1900, 31 Stat. 153, 48 U.S.C.A. § 532; Respondent's Exhibits 1, 4 and 5.

[3] Ex parte Glockner, D.C.Haw.H.C.No. 295; Ex parte Seifert, D.C.Haw.H.C.No. 296; Ex parte Batchelor, D.C.Haw.H.C. No.297; Ex parte Duncan, D.C.Haw.H. C.No.298, 66 F.Supp. 976; Ex parte White, D.C.Haw., 66 F.Supp. 982.

[4] Respondent's Exhibit No. 12.

[5] Respondent's Exhibits 14–17 inclusive.

[6] Respondent's Exhibit No. 1.

[7] See press statement by E. J. Ennis, Special Assistant to the Attorney General, Honolulu Star-Bulletin Oct. 22, 1943, Honolulu Advertiser Oct. 23, 1943.

to the slightest extent jeopardized by this court inquiring into the right of the military to detain a civilian for violation of a Territorial law. The privilege cannot remain suspended by fiat after all reason for its suspension has passed. The threat of Hawaii of invasion has fortunately passed and it is highly appropriate that some of the things done in the name of war be judicially measured.

(2) Next it is argued though the court holds—as it does—that it has the judicial power to call upon the respondent to justify under law his detention of Spurlock, its inquiry is limited to determining whether or not the power to declare martial law was properly invoked. This is referred to as the theory of absolute martial law and reliance is placed upon several supporting old cases.[8] The doctrine is that martial law can be terminated only by the one given the original power to invoke it—the Executive. In short the proposition is that whether at any given time factual necessity supports the continuation of a state of martial law is a political and not a judicial question. The same idea is currently expressed in modern garb in the statement that in time of war the courts cannot question the judgment of the Executive—whether that judgment is based on facts or not. By such a specious doctrine did Hitler and his ilk rise to dictatorial power. If ever such was the law of this country it long since has been slain by the Supreme Court.[9] Under our form of government the military even in time of war is subordinate to the civil power, not superior to it. During war the military to be sure is allowed a wide range of discretion, but whether it has abused that discretion is a judicial question.

(3) Respondent advances to sounder ground when he argues that the validity of a state of martial law is a judicial question, but upon the facts supporting the military conclusion that its invocation or continuance is necessary, the court will not substitute its judgment for that of the military where upon the facts reasonable men might differ as to the warranted conclusion. As the Supreme Court recently put it, the courts will not interfere with the judgment of the military unless its judgment can be said to be unreasonable.[10]

(4) All of this argument leads to the respondent's proposition that martial law was validly in existence at the time Spurlock appeared in the Provost Court in March 1942. It is further said that the question of the validity of martial law must be decided in this case.

I subscribe to the rule that given a reasonable basis in fact for the conclusion that martial law is necessary, the courts will not substitute their judgment for that of the Executive. Upon the facts, and following this theory, I could see my way clear to agree with respondent that up until the conclusion of the Battle of Midway martial law in Hawaii validly obtained. From this conclusion I would even be inclined to deduce that accordingly martial law might justify the trial in provost courts of civilians charged with violations of General Orders squarely and sensibly related to military necessity at the time, such as indicated in General Short's proclamation.[11] But I am not required to decide either of those points in this case.

Let it be assumed that martial law was valid in March 1942, the question is: Did that make necessary the trial of a civilian in a provost court upon a charge of violating Territorial law?

(5) Let us also get back to facts and be not blinded by interesting yet inapplicable arguments.

What we here deal with is martial law as declared by the Governor of Hawaii. What the General himself might have done, but did not do, is beside the point. When the Governor declared martial law all of the powers of the Territorial

[8] Martin v. Mott, 1827, 25 U.S. 19, 12 Wheat. 19, 6 L.Ed. 537; Luther v. Borden, 1849, 48 U.S. 1, 7 How. 1, 12 L.Ed. .581; In re Kalanianaole, 1895, 10 Haw. 29; Barcelon v. Baker, 1905, 5 Philippine .87.

[9] Sterling v. Constantin, 1932, 287 U.S.

378, 53 S.Ct. 190, 77 L.Ed. 375; The Law of Martial Rule, Fairman, 2d Ed., pp. 99–107.

[10] Kiyoshi Hirabayashi v. United States, 1943, 320 U.S. 81, at pages 93, 101, 63 S.Ct. 1375, 87 L.Ed. 1774.

[11] Respondent's Exhibit No. 2.

government did not go to the General despite the contention in this respect. The December 7 proclamation itself answers this. Governor Poindexter purported to delegate to the General his "normal" powers, the powers of the counties and the judicial powers of the Territorial courts. He reserved his M-Day Act powers, though amusingly one of General Short's first steps purported to validate the acts of Governor Poindexter performed thereunder. Further Governor Poindexter did not even purport to give the General the powers of the Territorial legislature, and the legislature met under martial law in 1943 without the General's permission. In brief, the Governor's declaration of martial law gave the General no independent powers. Under the proclamation he was to act in aid of the Governor, not in spite of him. Preventive martial law, not punitive, was declared. Hawaii was not a conquered territory, nor was it in rebellion. It was in danger—in danger of invasion—and as a means of controlling the civilian population in that emergency, to prevent confusion, disorder, panic and possible interference with the military, as a second thought (his first being to invoke the M-Day Act) the Governor declared martial law. Had he stopped with the declaration of martial law and the suspension of the writ things would no doubt have been different. But we know he went beyond his powers and purported to delegate to the General his own normal powers, the judicial powers of the Territorial courts and the powers of the counties. That he had no right or power to do this delegating has been decided by the White case. Yet the point to notice when respondent states that he does not rely upon such delegated powers is that the General's every act shows that he did.[12] Respondent's fine theory does not correspond with the facts. The only way the General ever claimed the judicial powers of the Territorial courts was by the Governor's delegation of them. Thus we see that facts make applicable the first ruling in the White case.

(6) Let us look again at the contention that it was necessary to try civilians for violations of Territorial law in provost courts, and I believe that we will see distinctly that the answer to the problem is that the proposition is based upon a mistake of law.

Why was it necessary? Because the General said so and the Chief Justice of the Territorial Supreme Court assumed the power to close all Territorial courts.[13] Why did the General say so? Because his advisors had told him, no doubt, that under the Milligan case[14] it was the law that martial law was not valid if the civil courts were open and functioning. Therefore to preserve the validity of martial law, the General closed the Territorial courts. There was then no tribunal to enforce the Territorial criminal laws. Criminals had to be punished, therefore it was necessary to handle them in the only court which was open—the provost court.

 This all sounds very nice until you examine it and realize that the civil courts can be open and functioning—as they were here December 8 until they were closed by military order—and martial law can still be valid. The dicta of the Milligan case is now generally regarded as inaccurate.[15] Martial law is the law of public necessity. It is not a question of all or nothing. Where the civil courts have been dispossessed and are not able to function, such may be a reason for invoking martial law. That is quite a different thing from saying that martial law requires the closing of the civil courts.

 Here also in addition to being mistaken as to the law the General created the necessity of trying civilians for violations of Territorial law in provost courts. As heretofore remarked, necessity cannot be manufactured, it must be real. Lacking the factual basis of necessity, for the Territorial courts were functioning and could have operated in their own sphere without hin-

---

[12] Respondent's Exhibits Nos. 2, 6B, 6C, 6D.

[13] Respondent's Exhibits Nos. 2, 7.

[14] Ex parte Milligan, 1866, 71 U.S. 2, 4 Wall. 2, 18 L.Ed. 281.

[15] The Law of Martial Rule, Fairman, 2nd Ed. pp. 157 et seq.

dering the military, it cannot be said that it was reasonably necessary from a military viewpoint to so try civilians in provost courts. All of the other reasons assigned are not reasons of necessity but of desirability. There has never been any reason why the Territorial courts could not have operated efficiently within their own jurisdiction while the military confined the sphere of their activities to things which had real military rather than artificial significance.

■ (7) Finally, even if it be said that thus to try civilians in provost courts was necessary because the General said so, Spurlock did not even receive a fair military trial. Surely the Constitution assures him that much.[16]

■ The respondent upon whom the burden rested to justify Spurlock's detention in point of law having failed to sustain that burden, the privilege of the writ is granted and the petitioner is discharged and his bond cancelled.*

[16] United States ex rel. Innes v. Hiatt, Warden, et al. (United States ex rel. Innes v. Stimson), 3 Cir., 1944, 141 F.2d 664, at page 666.

\* Office of Internal Security
 Iolani Palace Grounds
 Honolulu 2, T. H.
Commanding General
United States Army Forces
Pacific Ocean Areas 3 February 1945
 Order
1. Whereas Frederick L. Spurlock, also known as Fred Lorenza Spurlock, also known as Frederick Lorenza Spurlock, also known as Fred L. Spurlock, also known as Frederick Lorenzo Spurlock, also known as Lorenza Frederick Spurlock, also known as Fred Spurlock, hereinafter referred to as Frederick L. Spurlock being case No. 2555-H, duly was convicted on or about 28 March 1942, by John R. Hermann, Lieutenant Colonel, Infantry, sitting as a Provost Court at Honolulu, Territory of Hawaii, of the offense of assault and battery with a deadly weapon, in violation of Section 5656, Revised Laws of Hawaii, 1935, and duly was sentenced upon said conviction on said day by said Court to be confined at hard labor in Oahu Prison for a period of five (5) years; and, whereas, two (2) years and six (6) months of the aforesaid sentence of confinement at hard labor in Oahu Prison for a period of five (5) years were remitted by order of the Military Governor of the Territory of Hawaii, dated 8 February 1943; and

2. Whereas, it appears to the best interest of the United States that the execution of so much of the sentence of said Frederick L. Spurlock as remains unexecuted on this 3 February 1945 be remitted so that he may engage in work that will promote the national defense of the United States;

3. Now, therefore, it appearing proper, it hereby is ordered that so much of the sentence of the said Frederick L. Spurlock as remains unexecuted on this 3 February 1945, be, and the same hereby is, remitted.

 /s/ Robert C. Richardson, Jr.
 ROBERT C. RICHARDSON, Jr.
Lieutenant General, United States Army
Commanding General, United States
 Army Forces, Pacific Ocean Areas
A TRUE COPY:
 /s/ Wm. R. C. Morrison
 WM. R. C. MORRISON
 Brigadier General, U. S. A.
 Executive